# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____
                              :
BRYAN DOYLE GILREATH,        :
                              : Civil Action No. 11-5228 (MAS)
            Petitioner,      :
                              :
    v.                          : **OPINION**
                              :
GREG BARTKOWSKI, et. al.,     :
                              :
           Respondents.    :
_____:

**APPEARANCES:**

> **ALAN L. ZEGAS, ESQ**
> 552 Main Street
> Chatham, New Jersey 07928
> Counsel for Petitioner
>
> **KEITH ERIC HOFFMAN, ESQ.**
> PASSAIC COUNTY PROSECUTOR'S OFFICE
> 401 Grand Street
> Paterson, New Jersey 07505
> Counsel for Respondents

**SHIPP**, District Judge

Petitioner Bryan Doyle Gilreath ("Petitioner") challenges his 2008 New Jersey state court conviction in this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. For the reasons discussed below, the petition will be denied for lack of merit.

## I. BACKGROUND

### A. Procedural History

Petitioner was indicted by a Passaic County Grand Jury, under a twelve count Indictment No. 97-02-0129, on charges of first degree aggravated sexual assault, third degree endangering the welfare of a child, terroristic threats, criminal sexual contact and multiple counts of first degree kidnapping and second degree sexual assault.  (ECF No. 1, Petition at ¶ 1.)  At trial, the indictment was amended to show (Count 1) first degree aggravated assault; (Count 2) second degree sexual assault; (Count 3) third degree endangering the welfare of a minor; (Count 4) first degree kidnapping; (Count 5) first degree kidnapping, sexual assault and endangering the welfare of a child; and (Count 6) third degree terroristic threats.  (*Id.* at ¶ 3.)

Before trial, Petitioner moved for a hearing to determine the admissibility of an out-of-court identification pursuant to *United States v. Wade*, 388 U.S. 218 (1967).  On March 5, 1998, the Honorable Sylvan G. Rothenberg, J.S.C. denied the motion.  (*Id.* at ¶ 4.)  Petitioner then filed a motion for leave to file an interlocutory appeal before the Superior Court of New Jersey, Appellate Division, challenging Judge Rothenberg's Order denying the *Wade* hearing.  The Appellate Division denied Petitioner's motion on April 16, 1998.  (*Id.* at ¶ 5.)

A jury trial then followed on various dates between September 14, 1998 and September 29, 1998, with Judge Rothenberg presiding.  On September 29, 1998, the jury convicted Petitioner on all six counts of the amended Indictment.  (*Id.* at ¶¶ 2, 6.)

On February 2, 1999, Judge Rothenberg sentenced Petitioner to an aggregate term of fifty years in prison with a 27½-year parole disqualifier.  (*Id.* at ¶ 7.)

On April 6, 1999, Petitioner filed a direct appeal from his conviction and sentence before the Superior Court of New Jersey, Appellate Division.  The Appellate Division affirmed the

conviction and sentence in a written Opinion dated June 15, 2000.  The Supreme Court of New

Jersey denied certification on October 24, 2000.  (*Id.* at ¶¶ 13, 14.)

Thereafter, Petitioner filed a petition for post-conviction relief ("PCR") in state court

asserting various claims of ineffective assistance of trial and appellate counsel.  The state PCR

court held 20 non-consecutive days of hearing testimony, and denied the PCR petition on

October 22, 2007.  Petitioner appealed from the PCR court's decision, and the Appellate

Division affirmed the ruling in a written opinion filed on December 20, 2010.  The Supreme

Court of New Jersey denied certification on September 9, 2011.  (*Id.* at ¶¶ 16-18.)

On September 9, 2011, Petitioner filed this habeas petition pursuant to 28 U.S.C. § 2254.

He is represented by counsel.  Petitioner requests a hearing pursuant to 28 U.S.C. § 2254(e).  (*Id.*

at ¶ 20.)  A brief in support of habeas relief was filed on January 9, 2012, together with an

appendix of the relevant state court record.  (ECF Nos. 6, 6-1 through 6-24.)

On October 4, 2012, the State filed a response to the petition.  (ECF No. 19.)  The State's

appendix was docketed at ECF No. 17, and identified in the State's brief at page v.  (ECF No.

19-1.)

On March 15, 2013, Petitioner filed a motion to strike the State's brief and appendix.[1]

(ECF No. 23.)   On May 28, 2013, this Court granted Petitioner an extension of time until March

15, 2013, to file his reply.  (ECF No. 27.)  No reply brief was filed by Petitioner.

---

[1] This Court denies Petitioner's motion to strike the State's Brief and Appendix in this matter.
The appendices contain material used during the PCR plenary hearing and was submitted by the
State on state PCR review.  Moreover, the materials concern matters placed in issue by Petitioner
himself in this habeas action.  Finally, the only document utilized by this Court in reaching its
decision on a claim of prosecutorial misconduct raised by Petitioner without any evidentiary
support for said claim is the unpublished Appellate Division opinion in *State v. Gilreath*, Docket
No. A-1097-01T3 (Sep. 29, 2003).  (ECF No. 17-5, at Ra367-Ra385.)  This Court takes judicial
notice of the Appellate Division's decision only to establish a time reference that was not
provided by Petitioner in raising his claim of prosecutorial misconduct as it relates to another

B. <u>Statement of Facts</u>

This Court, affording the state court's factual determinations the appropriate deference, *see* 28 U.S.C. § 2254(e)(1), will simply reproduce the recitation as set forth in the June 15, 2000 opinion of the New Jersey Appellate Division as to Petitioner's direct appeal:

> At trial, the State presented the following evidence. L.S., the victim, was eleven years old on September 6, 1996, the date defendant kidnaped and sexually assaulted her. The incident occurred just after 4:00 p.m. It rained throughout the day.
>
> L.S. was walking home from a bakery when a man approached her. The man asked her twice what time it was, and she replied that she did not know, kept walking, and crossed the street. Shortly after that, the same man grabbed her from behind, with one hand around her waist and the other over her mouth, and carried her behind a red house.
>
> The man forced L.S. to touch his penis and then to put it into her mouth. During the assault, the man made sexual remarks to L.S. He also put his hands around her throat and told her that if she did not do as he instructed, he would strangle her. The man apparently ejaculated into her mouth and then told her to spit it into his hand. He then "splashed" the fluid into the bushes.
>
> At that moment, the woman who lived in the red house opened her door, and the man told L.S. to run away, which she did. L.S. ran home and told her sister part of what had happened. L.S. told her sister only that the man had grabbed her and threatened her. She was able, however, to describe the man to her sister. L.S.'s sister was not sure what to do, so she telephoned her friend Shannon, whose father is a police officer. Shannon came over to the house, and the girls called the police.
>
> Officer Kevin Gottheiner arrived at L.S.'s home at approximately 5:25 p.m. L.S. told Gottheiner the same thing she told her sister and described the man in the same way, as being a thin white male, with short, curly black hair, around five foot nine,[2] wearing green shorts and a green, yellow and red jacket or shirt. Gottheiner drove L.S. back to the scene of the assault so that he would know exactly where the event had taken place. When they returned to L.S.'s house, her mother was there, and the officer updated the mother on what had happened. Before he left, Gottheiner asked L.S. if she remembered what the man looked like well enough to describe him to a sketch artist, and L.S. replied "yes." After he left the residence, Gottheiner continued to search the area for the perpetrator. Gottheiner later returned to the scene of the assault, but was unable to retrieve any evidence because the rain had washed it away.

---

case for which Petitioner was charged with accosting young girls in Ridgewood, New Jersey, a month after the incident for which he was convicted in this case.

[2] L.S. reported that the man was approximately the same height as her father, who is five foot nine.

Shortly after Gottheiner left, L.S. revealed the entire episode to her mother. Her mother in turn telephoned Gottheiner to advise him of the full extent of the assault. Gottheiner reported the new information to Detective Cappucio, who told him that sexual assault cases of juveniles under the age of twelve were handled by the county prosecutor's office. The police then advised the prosecutor's office of the situation.

In accordance with procedure, Gottheiner did not speak with L.S. again about the incident. He did, however, return to the home to pick up the clothing that L.S. was wearing at the time of the assault. Gottheiner told L.S. and her mother that the prosecutor's office would conduct an interview with L.S. on Monday.
On Monday, September 9, 1996, L.S. and her mother went to the Child Advocacy Center, a facility specially designed by the prosecutor's office for interviewing children. The prosecutor's office videotaped L.S.'s interview with Investigator Marotta. Investigator Herten and Detective Cappucio observed the interview on a television monitor. L.S. did not know that she was being videotaped or monitored. It is the policy of the prosecutor's office to videotape allegations of sexual abuse or assault on children under twelve.

On September 11, 1996, L.S. went to the police station with her mother to help the police compose a sketch of the man who assaulted her. L.S. first gave a general description of her assailant to Lieutenant Trowbridge and then looked through groups of photographs to pick out features that matched those of her assailant. At this time, L.S. was not trying to identify defendant from the photographs. She was merely trying to find features similar to defendant's to facilitate the sketching process.

Lieutenant Trowbridge testified that in developing these sketches, he always tries to ask open-ended questions so as not to influence what the person tells him. Although Trowbridge did not document the exact changes that L.S. instructed that he make to the drawing, he testified that he effectuated whatever changes she requested. Trowbridge also stated that people always make corrections to the initial sketches and that he does not normally document the alterations. The sketch was completed and circulated, and the police began to gather photographs of suspects based on the sketch.

L.S. first viewed a photo array on September 20, 1996. She looked at a total of twelve pictures, but did not find the man who assaulted her. The pictures were presented to her in two groups of six. Defendant's picture was not in either group. Before she viewed the photographs, Detective Cappucio explained to L.S. that it was important not to pick a photograph unless she was sure, and that this process also helped the police rule out people who are innocent. Detective Cappucio testified that L.S. looked at the pictures very carefully before telling him that the man was not there.

L.S returned to the police station on October 23, 1996, to view another set of photographs. Detective Cappucio gave L.S. the same instructions as he had previously. He presented L.S. with a set of six photographs, in a manner consistent with the September procedure. Defendant's photograph was included in this array as photograph number three. L.S. picked out defendant's picture as that of her assailant. The picture of

defendant was taken in front of a jail cell door.  Neither the sketch interview, nor either of the photo line-up interviews was videotaped.

Once L.S. identified defendant, the police conducted another videotaped interview with her so that they would have enough information to obtain a search warrant.  The second interview took place on November 6, 1996, at the Child Advocacy Center, and was conducted by Investigator Escobar.  The second interview took place in the same manner as the first and was monitored by Marotta and Cappucio.  Escobar questioned L.S. specifically about the clothes her attacker wore and asked for any further details that L.S. could recall.  Escobar also questioned L.S. about the man's hands, whether she recalled any specific smells, and whether the man had any scars.  L.S. did not recall anything new about his hands, nor did she recall any smells or remember any scars.

On November 12, 1996, pursuant to a search warrant, the police seized several items of clothing from defendant's residence.  Although the clothes resembled those described by L.S., she did not identify any of this clothing as that worn by her attacker.  Defendant was subsequently arrested.

At trial, defendant presented his case as one of misidentification.  Defendant is a house painter by trade.  His wife and a neighbor testified that he was painting the neighbor's house on the day of the assault.  Defendant also apparently has several scars on his face.

(ECF No. 6-1, Petitioner's Appendix ("Pa") at Pa48-Pa53, *State v. Gilreath*, Docket No. A-4118-98T2, slip op at 2-7.)

## II.  STATEMENT OF CLAIMS

Petitioner raises the following claims for habeas relief:

Ground One:  Ineffective assistance of trial counsel in failing to call an alibi witness, failing to investigate, failing to consider or retain an expert to discredit identification testimony, failing to call twenty available character witnesses, failing to prepare witnesses for trial testimony, failing to call Petitioner as a witness on his own behalf, failing to argue that the jury verdict was against the weight of the evidence at trial, failing to raise serious issues of juror misconduct, and failing to file a motion to dismiss the indictment based on prosecutorial misconduct.

Ground Two:  Prosecutorial misconduct in presenting false and misleading evidence to the grand jury, withholding exculpatory evidence of another attacker committing sexual assaults in the same vicinity and proximate time as the charged offense, tainting the in-court identification of Petitioner, and failing to video-tape the photo line-ups and sketch production and failing to preserve the stock photos used in the sketch composite process.

Ground Three:  Trial court's failure to grant a *Wade* hearing violated Petitioner's constitutional right to a fair trial.

Ground Four:  Habeas relief should be granted under the cumulative error doctrine.

(ECF No. 6, Petitioner's Brief at 15-125.)

The State contends that Petitioner's claims for habeas relief should be denied for lack substantive merit.  (ECF No. 19-1, Respondent's Answer.)

## III.  STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254, this Court has jurisdiction to entertain a petition for federal habeas relief as follows:

> [A] district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

28 U.S.C. § 2254(a).

As to any claim adjudicated on the merits in state court proceedings, the writ shall not issue unless the adjudication of the claim

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *see also Parker v. Matthews*, 132 S. Ct. 2148, 2151 (2012).

"Clearly established Federal law" is determined as of the date of the relevant state court decision and is limited to the record that was before the state court that adjudicated the claim on the merits. *Greene v. Fisher*, 132 S. Ct. 38, 44-45 (2011); *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011). A state-court decision is "contrary to" clearly established federal law if the state court (1) contradicts the governing law set forth in Supreme Court cases or (2) confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different result. *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000); *Jamison v. Klem*, 544 F.3d 266, 274 (3d Cir. 2008). The state court judgment must contradict clearly established decisions of the Supreme Court, not merely law articulated by any federal court, *Williams*, 529 U.S. at 405, although district and appellate federal court decisions evaluating Supreme Court precedent may amplify such precedent, *Hardcastle v. Horn*, 368 F.3d 246, 256 n. 3 (3d Cir. 2004) (citing *Matteo v. Superintendent, SCI Albion*, 171 F.3d 877, 890 (3d Cir. 1999)). "[C]ircuit precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court,' [and] therefore cannot form the basis for habeas relief under AEDPA." *Parker*, 132 S. Ct. at 2155. The state court is not required to cite or even have an awareness of governing Supreme Court precedent "so long as neither the reasoning nor the result of [its] decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002); *Jamison*, 544 F.3d at 274–75. Few state court decisions will be "contrary to" Supreme Court precedent.

The federal habeas court more often must determine whether the state court adjudication was an "unreasonable application" of Supreme Court precedent. A state-court decision involves an "unreasonable application" of clearly established federal law if the state court (1) identifies the correct governing legal rule from the Supreme Court's cases but unreasonably applies it to

the facts of the particular case; or (2) unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply. *Williams*, 529 U.S. at 407. A showing of clear error is not sufficient. *Lockyer v. Andrade*, 538 U.S. 63, 75–76 (2003). Nor is habeas relief available merely because the state court applied federal law erroneously or incorrectly. *See Harrington v. Richter*, 131 S. Ct. 770, 785 (2011) (stating that under § 2254(d)(1), "an unreasonable application of federal law is different from an incorrect application of federal law." (quoting *Williams* at 410)); *see also Metrish v. Lancaster*, 133 S. Ct. 1781, 1786–87 (2013); *Thomas v. Varner*, 428 F.3d 491, 497 (3d Cir. 2005); *Jacobs v. Horn*, 395 F.3d 92, 100 (3d Cir. 2005). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington*, 131 S. Ct. at 786 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." *Harrington*, 131 S. Ct. at 786–87. *See also Metrish*, 133 S. Ct. at 1787.

Federal courts must follow a highly deferential standard when evaluating, and thus give the benefit of the doubt to, state court decisions. *See Felkner v. Jackson*, 131 S. Ct. 1305, 1307 (2011); *Pinholster*, 131 S. Ct. at 1398; *Eley v. Erickson*, 712 F.3d 837, 845 (3d Cir. 2013). *See also Harrington*, 131 S. Ct. at 786 (stating habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal."); *Renico v. Lett*, 559 U.S. 766, 773 (2010) ("whether the trial judge was right or wrong

is not the pertinent question under AEDPA"); *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) ("question . . . is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable-a substantially higher threshold"); *Lockyer*, 538 U.S. at 75 (stating it is not enough that a federal habeas court, in its independent review of legal question, is left with firm conviction that the state court erred).  This standard applies even where "the state court analyzed and rejected a habeas petitioner's federal claims on the merits but gave 'no indication of how it reached its decision.'"  *Grant v. Lockett*, 709 F.3d 224, 230 (3d Cir. 2013) (quoting *Han Tak Lee v. Glunt*, 667 F.3d 397, 403 (3d Cir. 2012)).

A state court decision is based on an unreasonable determination of the facts only if the state court's factual findings are objectively unreasonable in light of the evidence presented in the state-court proceeding.  *Miller–El v. Cockrell*, 537 U.S. 322, 340 (2003).  Moreover, a federal court must accord a presumption of correctness to a state court's factual findings, which a petitioner can rebut only by clear and convincing evidence.  28 U.S.C. § 2254(e); *see Rice v. Collins*, 546 U.S. 333, 339 (2006) (petitioner bears the burden of rebutting presumption by clear and convincing evidence); *Duncan v. Morton*, 256 F.3d 189, 196 (3d Cir. 2001)(factual determinations of state trial and appellate courts are presumed to be correct).  Where a state court's factual findings are not made explicit, a federal court's "duty is to begin with the [state] court's legal conclusion and reason backward to the factual premises that, as a matter of reason and logic, must have undergirded it."  *Campbell v. Vaughn*, 209 F.3d 280, 289 (3d Cir. 2000).  In determining what implicit factual findings a state court made in reaching a conclusion, a federal court must infer that the state court applied federal law correctly.  *Id.* (citing *Marshall v. Lonberger*, 459 U.S. 422, 433 (1982)).

Even if the petitioner is entitled to habeas relief, the court will grant the writ only if the error was not harmless. Under the harmless error standard, "a court must assess the prejudicial impact of [the] constitutional error in [the] state-court criminal trial." *Fry v. Pliler*, 551 U.S. 112, 121 (2007). A court should hold the error harmless unless it led to "actual prejudice," in the form of a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (quotation omitted); *Eley v. Erickson*, 712 F.3d at 847.

A pro se pleading is held to less stringent standards than more formal pleadings drafted by lawyers. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *Haines v. Kerner*, 404 U.S. 519, 520 (1972). A pro se habeas petition and any supporting submissions must be construed liberally and with a measure of tolerance. *See Rainey v. Varner*, 603 F.3d 189, 198 (3d Cir. 2010); *Royce v. Hahn*, 151 F.3d 116, 118 (3d Cir. 1998).

## IV. DISCUSSION

### A. Ineffective Assistance of Counsel Claims

In his first ground for habeas relief, Petitioner raises various claims of ineffective assistance of counsel. To prevail on a claim of ineffective assistance of counsel in a § 2254 case, Petitioner must show that (1) counsel's performance was so deficient as to deprive him of the representation guaranteed under the Sixth Amendment of the Constitution, and (2) the deficient performance prejudiced the defense by depriving the defendant of a fair trial. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see also Glenn v. Wynder*, 743 F.3d 402, 409 (3d Cir. 2014) (holding that, in an ineffective assistance of counsel claim, petitioner must prove (1) that his trial counsel's performance was so deficient in that it fell below an objective standard of reasonableness, and (2) prejudice by showing a reasonable probability that, but for counsel's deficient performance, the outcome at trial would have been different) (citing *Strickland*, *supra*).

"The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686; *Ross v. Varano*, 712 F.3d 784, 797–98 (3d Cir. 2013).

"Since Strickland, the Supreme Court and [the Third Circuit] have emphasized the necessity of assessing an ineffectiveness claim in light of all the circumstances." *Siehl v. Grace*, 561 F.3d 189, 195 (3d Cir. 2009) (citing cases). When a federal habeas petition under § 2254 is based upon an ineffective assistance of counsel claim, the "pivotal question is whether the state court's application of the *Strickland* standard was unreasonable," which "is different from asking whether defense counsel's performance fell below *Strickland*'s standard." *Grant*, 709 F.3d at 232. For purposes of § 2254(d)(1), an unreasonable application of federal law is different from an incorrect application of federal law. *See id.* "A state court must be granted a deference and latitude that are not in operation when the case involves [direct] review under the *Strickland* standard itself." *Id.* Federal habeas review of ineffective assistance of counsel claims is thus "doubly deferential." *Id.* (quoting *Pinholster*, 131 S.Ct. at 1403). Federal habeas courts must "take a highly deferential look at counsel's performance" under *Strickland*, "through the deferential lens of § 2254(d)." *Id.* (internal quotations and citations omitted). As the Third Circuit recently stated, "the Constitution guarantees criminal defendants only a fair trial and a competent attorney. It does not insure that defense counsel will recognize and raise every conceivable constitutional claim." *U.S. v. Travillion*, --- F.3d ----, 2014 WL 3029837 at *3 (3d Cir. 2014) (quoting *Engle v. Isaac*, 456 U.S. 107, 134 (1982)). On habeas review, courts "must indulge a strong presumption that counsel's conduct falls within a wide range of reasonable

professional assistance." *Travillion*, *supra* (quoting *Strickland*, 466 U.S. at 689, and *Berryman v. Morton*, 100 F.3d 1089, 1094 (3d Cir. 1996)).

In this case, Petitioner raised all of his ineffective assistance of trial counsel claims in a timely and lengthy state PCR proceeding. The PCR judge, the Honorable Raymond A. Reddin, J.S.C., who was not the trial judge, conducted a 24-day plenary hearing to address the numerous issues presented by Petitioner.[3] At the conclusion of the hearing, Judge Reddin found that Petitioner had not shown sufficient grounds to warrant post-conviction relief and denied the petition. In an extensive written decision, the PCR judge succinctly concluded:

> [D]efense counsel did the best he could[ ] with what he had to work with. He called and didn't call certain witnesses; he objected to proffered evidence; he made various motions; he put on an alibi defense and he gave a commendable summation considering ... what he had to work with. The defendant did not testify. The jury saw and heard all of the evidence. It was evidence that could not be modified or altered. A good lawyer may be able to bend the facts, but he or she cannot change them. This [c]ourt gets the sense that the State's witnesses were very credible and the jury obviously believed them. Mr. Neary was clearly prepared. He made countless points in his cross-examinations and in his arguments to the jury. All of these points raised by [defendant] about what trial counsel did or did not do, in this [c]ourt's opinion, are trivial in the overall scheme of things and would have absolutely no effect on the outcome of the trial, had the trial been conducted differently. All of these criticisms of the trial attorney ... illustrate a perfect example of the type of hindsight analysis that ... should not be the standard of review in assessing counsel's performance.... The defendant, as has been said, is not entitled to a perfect trial. He is entitled to a fair trial. Notwithstanding all of the points raised, it is clear that the evidence against the defendant was monumental and he received a very fair trial.

(*State v. Gilreath*, 2010 WL 5140465, *9 (N.J. Super. A.D. Dec. 20, 2010). (See ECF No. 6-3, Pa202-Pa203 - October 22, 2007 Decision of the Court on PCR Motion (hereinafter "PCR

---

[3] The state PCR record shows that the plenary hearing was conducted for 25 days (the 25th day comprised the PCR court's ruling) spanning a 14-month period, with testimony from 22 witnesses. The transcripts of the PCR proceedings exceed 1800 pages. Two experts testified on Petitioner's behalf. Defense counsel, Brian Neary, testified for four days, producing 355 transcript pages. The prosecutor, Lisa R. Squitieri, also was questioned for two days. Petitioner himself testified for almost six days, yielding 515 transcript pages. Finally, the State notes that over 60 exhibits were introduced into evidence during the PCR proceedings and considered by the PCR court in reaching its decision to deny post-conviction relief. (ECF No. 19-2, Respondents' Brief at 47.)

Decision") at 22-23.)   The Appellate Division affirmed the denial of the PCR petition in a lengthy and thorough opinion.  *State v. Gilreath*, 2010 WL 5140465 (N.J. Super. A.D. Dec. 20, 2010).

This Court addresses each ineffective assistance claim as asserted by Petitioner in turn below.

    1.  *Failure to call Mrs. Cava as alibi witness.*

Petitioner contends that his trial counsel was deficient in failing to call Linda Cava as an alibi witness, instead calling Cava's husband who was unprepared and ineffectual to substantiate an allegedly legitimate alibi defense.  Critical to this issue, on the PCR appeal, the Appellate Division recounted trial testimony from Detective Cappuccio regarding the Cavas' visit to the Haledon Police Department on February 26, 1997, to give statements concerning Petitioner's whereabouts on the day that L.S. was assaulted in Haledon, New Jersey.  *Gilreath*, 2010 WL 5140465 at *4.  On that date, Linda Cava told the police that she and her husband, James, knew Petitioner was not the culprit because Petitioner was painting their house on September 6, 1996. When Cava was asked how she knew September 6th was the date that L.S. was sexually assaulted, Cava responded that she was not sure, but she also said "maybe I saw a sketch or a picture of him. My husband keeps up with that, you should speak to my husband."  *Id*.  When Detective Cappuccio asked Linda Cava about the events of September 4, 1996, she responded, "I can't remember back four months" and "I knew you were going to do this[,] asking for a lot of details."  *Id*.   Linda then asked if her husband James could be present during the interview, but the police declined, explaining that it could influence the statements.  At that point, Linda "demanded a break [,] abruptly, got up, walked out of the room and exited the building."  *Id*. The officers followed Linda and overheard her speaking to James outside.  When James asked

her to go back in, she responded, "[t]hey're asking too many details." *Id*. The police told the Cavas that they would not force anyone to give a statement, so Linda left the police station. However, James returned inside to give a statement, claiming that "We want justice done." *Id*. In his statement, James claimed that, on September 6, 1996, he went running at about 4:30 and returned at about 5:15. Detective Cappuccio's report noted that "[a]t this point James asked Detective Cappuccio 'the girl was assaulted about 4:30 or 5:00, isn't that right?'" *Id*. James further told the police that Petitioner came to the Cava home with his wife to discuss the Haledon sexual assault and stated, "I need your help, you might need to give testimony." *Id*. James also stated that a detective hired by Petitioner's counsel had visited the Cava home and recorded statements from both James and Linda. *Id*.

At the PCR hearing, Petitioner's trial counsel, Brian Neary, Esq., testified. He stated that he had reviewed the statements given by the Cavas to Neary's investigator, and had met with the Cavas at their home to discuss their role in the case. Neary also recalled that he prepared the Cavas as potential alibi witnesses by discussing their knowledge of the facts over a long period of time. *Id*. at *7.

Neary also explained that he cautiously weighs the use of alibi witnesses because it can be "an ineffective and risky trial strategy because they can divert the jury's attention from the State's heavy burden to prove the defendant's guilt beyond a reasonable doubt and instead refocus the jury on the credibility or accuracy of the alibi witnesses." *Id*. Nevertheless, he chose to introduce Petitioner's alibi theory through James Cava, rather than Linda Cava because Neary believed James, as a retired naval officer who served and was injured in the Vietnam War, would present better on cross-examination than Linda. Neary further stated that he was concerned Linda would not perform well on cross-examination because she would be asked to explain why

15

she had initially gone to the police station to give an alibi statement but left the station before actually giving a statement.  Neary justified his decision not to call Linda as an alibi witness on his belief that her refusal to give a statement to the police "would damage her credibility and compromise her usefulness as an effective alibi witness."  *Id.*  Moreover, Neary explained he believed the most effective defense in Petitioner's case was to expound on the weaknesses in L.S.'s identification.  *Id.*

While Linda Cava did not testify at trial, she did testify at the PCR hearing, giving a detailed account of her activities on September 6, 1996.  First, Linda stated that Petitioner's wife had arrived at the Cava home at approximately 5:40 p.m.  Linda recalled this because she had overheard Petitioner and his wife discuss what to eat for dinner.  Linda further testified that she remembered that Petitioner had worked late that day painting at her home, because "[h]is father was coming back on Sunday and he wanted to have the job completed."  *Id.* at 8.

When asked why she left the police station before giving a statement, Linda stated: "I felt quite intimidated. I just was very uncomfortable."  *Id.*  She acknowledged she "had only met [Petitioner] approximately a week before he started the job"; she did not know defendant well; and her relationship to his family was a neighborly one.  Linda further remarked that Neary had visited her home twice to talk with her and her husband, and that each visit was approximately twenty minutes long without discussion of any substantive facts of the case.  *Id.*

On cross-examination, Linda was questioned about a February 1997 statement she made to the police, in which she claimed she had known Petitioner and his wife for more than 1½ years and had visited each other's homes.  Linda testified that she did not recall making that statement and confirmed that she had never met Petitioner until he came to her home accompanied by his father for the painting job.  *Id.*

16

At the conclusion of the plenary hearing, Judge Reddin found that defense counsel had made a "strategic decision not to call" Linda Cava.  (ECF No. 6-24, Oct. 22, 2007 PCR Transcript at 58:21-23.)  Judge Reddin commented that counsel Neary had spoken to Linda Cava before trial, and had his investigator take a detailed lengthy statement from her, so Neary knew what the witness would say.  Neary also was aware that there was a risk on cross-examination because Linda had left in the middle of an interview with the police.  Nevertheless, Neary placed Linda Cava on the witness list for trial.  (*Id.*, 59:1-11; 62:1-18.)

Judge Reddin further stated that, during the PCR testimony, Linda Cava was a fairly credible witness, but he would not qualify her as a key alibi witness and her testimony would not likely have changed the outcome of trial.  (*Id.*, 61:4-12.)  The judge noted that Linda's testimony on cross-examination was potentially damaging because the prosecutor could have called on rebuttal the police officer questioning Cava to show that Cava became hysterical and ran out on the interview because the police were asking too many questions and wanted too much detail.  (*Id.*, 61:13-22.)  Moreover, Judge Reddin found that Linda Cava was not an alibi witness because she admitted that she laid down in her room for an hour from 4:30 to 5:30 p.m., while her husband was away on a jog, and got up to check on her son twice in 15 minute intervals during this time.  The assault on L.S. occurred extremely close to the Cava home by car or by foot, so the Cavas basically placed Petitioner in close proximity of the scene of the crime.  (*Id.*, 63:15-64:6.)

On the PCR appeal, the Appellate Division affirmed Judge Reddin's decision.  Specifically, the Appellate Division observed that Neary made a "calculated strategic decision" not to call Linda Cava because her husband was the stronger witness due to Neary's perception that James Cava would better withstand cross-examination.  The court commented that Linda

Cava's "abrupt departure" from the police station "after becoming frustrated with the fact that the detective was 'asking too many details,' raised serious issues as to her viability as a credible and supportive witness." *Gilreath*, 2010 WL 5140465 at *13. Moreover, the Appellate Division found that Linda Cava "was a high-risk witness" because she was not observing Petitioner at the critical time involved in the commission of the assault. *Id.*

Thus, the Appellate Division concluded that Neary's decision to call James rather than Linda as an alibi witness was a reasonable and strategic choice, and not indicative of deficient representation. More importantly, the Appellate Division found that the PCR judge properly concluded that Linda Cava's testimony would not have changed the outcome of the trial because she would have placed Petitioner in close proximity to the scene of the crime and had not observed Petitioner during the critical time span at issue. *Id.* at *14.

As stated above, in analyzing trial counsel's performance, the habeas court must be "highly deferential." *Strickland*, 466 U.S. at 689. The Third Circuit recently observed that *Strickland*'s test is demanding as there is a "strong" presumption that counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Branch v. Sweeney*, --- F.3d ----, 2014 WL 3293716, *7 (3d Cir. Jul. 9, 2014) (quoting *Burt v. Titlow*, --- U.S. ----, ----,134 S.Ct. 10, 17 (2013)). Petitioner faces a stringent requirement to show that, given all the circumstances of the case, "counsel's mistake was so egregious that it fell 'outside the wide range of professionally competent assistance.'" *Branch*, *supra* (quoting *Strickland*, 466 U.S. at 690). Moreover, the court must assess the reasonableness of counsel's performance at the time of trial and not with the benefit of hindsight. *Id.*

In this case, the Court finds that Petitioner has not established deficient performance by trial counsel, the first prong under Strickland, necessary to prevail on his claim that Neary was

ineffective in failing to call Linda Cava as an alibi witness. The facts and circumstances of the case at the time of trial plainly show that Neary's decision was a strategic one that should not be challenged in hindsight as Linda was shown to be a high risk witness at the PCR hearing. Furthermore, the state courts correctly determined that Linda Cava's testimony was unlikely to change the outcome of trial as her credibility could have been easily undermined, and her potential testimony would not have served as a strong alibi because it placed Petitioner near the scene of the crime at the critical time when Linda admitted that she was in her room.

Therefore, this Court is satisfied that the state courts correctly identified and applied the controlling Supreme Court precedent as to Petitioner's claim that trial counsel was ineffective given his decision not to call Linda Cava as an alibi witness. *See Parker*, 132 S.Ct. at 2151 (finding when state court has adjudicated petitioner's federal claim on merits, district court "has no authority to issue the writ of habeas corpus unless the [state court's] decision 'was contrary to, or involved an unreasonable application of, clearly established Federal Law, as determined by the Supreme Court of the United States,' or 'was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding'" (quoting 28 U.S.C. § 2254(d))). This claim is denied as substantively meritless.

2. *Failure to retain an identification expert.*

Next, Petitioner argues that trial counsel was ineffective because he failed to retain an identification expert to weaken the State's exclusive reliance on L.S.'s identification of Petitioner at trial. Petitioner contends that an expert could have addressed various aspects of identification issues, such as stress, forgetting curve, relation back, confidency-accuracy correlation, suggestiveness of pretrial identification procedures, exposure duration and memory distortion, to undermine the State's identification case. This claim was raised on PCR review and considered

19

during the PCR plenary hearing, where Petitioner presented the testimony of expert, Dr. Roy Malpass, to reinforce these potential themes of attack on the State's identification of Petitioner. (ECF No. 6, Pet. Brief at 42-59.)

Judge Reddin found Dr. Malpass to be extremely impressive in his credentials, but otherwise would not have made a good expert witness on eyewitness identification and memory issues for the defense at trial, finding the expert's potential testimony to be more harmful to Petitioner than helpful. (ECF No. 6-24, Oct. 22, 2007 PCR Transcript at 65:17-66:2.) Specifically, Judge Reddin noted that the expert could not have disputed the "remarkable" accuracy of the sketch to identify Petitioner, and on cross-examination would have had to admit to its striking similarity to Petitioner or risk being found untruthful by the jury if he stated otherwise. Moreover, the PCR Judge found the victim's identification to be so strong and truthful that on a sharp cross-examination, the expert's challenge to the identification on theoretical issues would have been detrimental to the defense rather than helpful. Judge Reddin noted that the prosecutor most likely would have confronted the expert witness with the fact that L.S. positively identified Petitioner as her assailant in the second group of photographs the police showed her, but she quickly determined that the man who sexually assaulted her did not appear in the first set of photographs. L.S.'s consistent conduct further emphasized the victim's identification to the jury in addition to the similarities between Lieutenant Trowbridge's sketch and Petitioner's face. The only issue of identification was the victim's failure to see Petitioner's scar, but Judge Reddin observed that the scar was not noticeably visible except upon close scrutiny, even in the photograph of Petitioner, and was inconsequential given the keen likeness of the sketch to Petitioner. (Id., 66:10-69:12; see also ECF No. 6-3 at Pa192-Pa193, PCR Decision at 12-13.)

On the PCR appeal, the Appellate Division found that trial counsel's decision not to call an identification expert was strategic and reasonable. The court agreed with Judge Reddin's conclusion that an expert witness probably would not have added any substantive assistance to the defense in this case and could have been harmful. "Considering the possible risks of drawing the jury's attention to weaknesses in the case and the questionable benefits of that potential testimony, Neary's failure to call such an expert witness does not constitute ineffective assistance." *Gilreath*, 2010 WL 5140465 at *15.

Moreover, the Appellate Division found that even if Neary should have called an expert, Petitioner failed to establish that the deficient performance actually prejudiced the defense. Indeed, the court concluded that Lt. Trowbridge's sketch combined with L.S.'s sound photo identification of Petitioner established a sufficient basis to conclude that the trail outcome would have been no different. *Id.* Thus, regardless of Petitioner's argument that the various factors identified in *United States v. Norwood*, 939 F. Supp. 1132 (D.N.J. 1996), may impact on an identification, such as stress, the forgetting curve, relation back, confidence-accuracy correlation, suggestiveness of pretrial identification procedures, exposure duration, memory distortion and cross-racial identification, the Appellate Division reiterated that "the identification here resulted in a composite sketch that proved to be an accurate representation of defendant as well as a later identification through a photo array and an in-court identification," and found no error in Judge Reddin's decision denying the PCR petition on this ground. *Id.*

This Court has carefully reviewed the state court record provided with regard to this claim, and concludes that the determinations of the state PCR court and appellate court in denying Petitioner's claim that his counsel was ineffective for failing to call an expert witness did not result in a decision that was contrary to, or involved an unreasonable application of, clearly

established federal law under *Strickland*, nor did it result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  *See Parker*, 132 S.Ct. at 2151; *Williams*, 529 U.S. at 413.  This Court agrees that an expert witness would not have added any substantial benefit against a strong and sympathetic eyewitness identification and a composite sketch that was strikingly similar to Petitioner.  Thus, even if counsel's decision not to call an expert constituted deficient performance, Petitioner did not establish prejudice, namely, that the outcome of trial would have been different.  Therefore, this claim is denied as substantively meritless.

   3.  *Failure to Call Character Witnesses.*

   Petitioner next argues that counsel was constitutionally ineffective for failing to call twenty available character witnesses at trial.  This claim was raised during the state PCR proceedings.  After reading affidavits from these character witnesses and hearing their testimony during the PCR proceeding, Judge Reddin concluded that counsel's decision not to call character witnesses was reasonable and strategic.  Neary testified that character witnesses typically do not aid the defense in terms of evidentiary impact, and often their value is diminished during cross-examination where weaknesses in their testimony may be exposed.  Indeed, Judge Reddin observed that, as a general rule, defense attorneys rarely use character witnesses for this very reason.  (ECF No. 6-24, Oct. 22, 2007 PCR Transcript at 69:15-70:1.)

   Judge Reddin also found that character testimony is usually limited to the defendant's reputation in the community for honesty, trustworthiness and integrity.  Thus, where the defendant does not testify, as in Petitioner's case, character testimony can backfire because it highlights this fact for the jury.  (*Id.* at 71:6-72:10.)  In his written decision, Judge Reddin concluded:

> This was not oversight.... Character witnesses are usually good friends and family members of the accused, who usually know very little about the facts of the case. Often times when they are confronted with the details of the case they do not help, but rather hurt the defendant.... [T]hey are ... less effective when the defendant elects not to testify and ... often highlight the fact that the defendant chose not to testify, despite all the safeguards regarding such a decision.

(ECF No. 6-3 at Pa193-Pa194, PCR Decision at 13-14.)

The Appellate Division affirmed Judge Reddin's ruling on appeal, finding that counsel's decision was a strategic choice. The court also stated that it would follow the New Jersey Supreme Court's instruction to be highly deferential to such strategic decisions made by counsel concerning which witnesses to call for trial, "especially here where it is unlikely that the outcome would have been different even with such witnesses." *Gilreath*, 2010 WL 5140465 at *15.

It is well settled that attorneys are not obliged to call every witness suggested to them by their clients. The decision of which witnesses to call to testify is strategic, and therefore left to counsel. *See Diggs v. Owens*, 833 F.2d 439, 446 (3d Cir. 1987), *cert. denied*, 485 U.S. 979 (1988). Attorneys may choose only witnesses who are likely to assist their theory of the case. *Reed v. Gavin*, Civ. No. 13-4257, 2014 WL 645232, *5 (E.D.Pa. Feb. 18, 2014). "The Sixth Amendment does not require that a criminal defense attorney leave 'no witness unpursued.'" *Lewis v. Blaine*, Civ. No. 00-3274, 2010 WL 753811, at *8 (E.D.Pa. Mar.1, 2010) (quoting *Jacob v. Horn*, 395 F.3d 92, 122 (3d Cir. 2005)). The decision of which witness to call "is precisely the type of strategic decision which the Court in *Strickland* held to be protected from second guessing." *United States v. Merlino*, 2 F.Supp.2d 647, 662 (E.D.Pa. 1997). Mere criticism of a trial attorney's tactic or strategy is not alone sufficient to support a claim of inadequate representation. *Id*.

This Court has not discovered any Supreme Court precedent prescribing a rule that directly governs Petitioner's claim. Neither has this Court found any rule imposing a mandatory

duty upon defense counsel to present every potential alibi or character witness that may be available.  The only situation where the Supreme Court has recognized a constitutional right to provide character evidence concerns capital punishment.  *See Boyde v. California*, 494 U.S. 370, 378–81 (1990) (holding that the Eighth Amendment requires a jury to consider the circumstances of the crime and the defendant's background and character during the sentencing phase in a capital trial).  Here, Petitioner's conviction did not raise any capital concerns.  Accordingly, the state court decisions in denying this ineffective assistance of counsel claim regarding a failure to call 20 character witnesses does not appear to be "contrary to" any clearly established Supreme Court precedent.

Nor are the state court rulings on this character witness claim "an unreasonable application of" clearly established Supreme Court jurisprudence.  As stated above, a state court's conclusion that counsel was not ineffective is a mixed question of law and fact.  The specific facts found by a state court in the course of deciding an ineffectiveness claim are accorded a presumption of correctness unless the state court's decision was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  28 U.S.C. § 2254(d)(2); *Berryman v. Morton*, 100 F.3d 1089, 1095 (3d Cir. 1996) (state court findings of historical fact made in the course of deciding an ineffectiveness claim are entitled to the presumption of correctness).  Petitioner has failed to produce any clear and convincing evidence to rebut this presumption.  *See* 28 U.S.C. § 2254(e)(1).  Thus, he fails to demonstrate how a parade of character witnesses having no actual knowledge of the case could, in any way, have bolstered his defense.  Their testimony about Petitioner's character, subject to potential weaknesses on cross-examinations, would not have negated the powerful identification evidence against Petitioner.  Indeed, it is entirely speculative that the general character evidence, unrelated

24

to material issues in the trial, would have led to a different result.  Thus, Petitioner cannot demonstrate that he suffered actual prejudice as a result of counsel's decision not to call twenty character witnesses.  Habeas relief on this claim is denied accordingly.

    4. *Failure to Prepare Witnesses for Trial.*

Petitioner also claims that trial counsel was ineffective in preparing witnesses for trial. Specifically, he argues that the alibi witness, James Cava, and Petitioner's wife, Blanca Gilreath, were not sufficiently prepared for their trial testimony.  Judge Reddin discerned no evidence that counsel failed to prepare witnesses for trial, crediting Neary's testimony that he met with each witness to discuss the underlying facts of the case and fully prepare them for trial.  Further, Judge Reddin found no merit to the specific charge that Neary failed to prepare James Cava for his trial testimony.  There was testimony that James Cava was prepped before trial, that Neary told Cava to say what happened and to tell the truth at trial.  (ECF No. 6-24, Oct. 22, 2007 PCR Transcript at 64:7-19.)  In his written decision, Judge Reddin remarked that Neary's "particular method of preparing a witness is his method.  If anything, this Court finds this entire point to be so over reaching that it is almost silly."  (ECF No. 6-3 at Pa194, Oct. PCR Decision at 14.)

On PCR appeal, the Appellate Division likewise found no merit to this claim.  The court reiterated that "Neary testified that he prepared witness by meeting with them personally and discussing their knowledge of the facts and involvement in the case.  The judge concluded that Neary's PCR testimony was credible and this finding is entitled to deference."  *Gilreath*, 2010 WL 5140465 at *16 (citing *State v. Johnson*, 42 N.J. 146, 161 (1964) (holding that a reviewing court should affirm trial court's fact-finding if supported by substantial credible evidence because a trial judge has the "opportunity to hear and see the witnesses and to have the 'feel' of the case")).

Petitioner's argument without factual support fails to persuade this Court that he has overcome the presumption that his counsel performed reasonably. Despite Petitioner's claim that his trial counsel did not sufficiently prepare his alibi witness, James Cava, the record indicates otherwise. This Court's review of Cava's trial testimony reveals very focused, confident, and detailed testimony by Cava that belies lack of preparation.

With respect to Blanca Gilreath, Petitioner argues that counsel did not adequately address or deal with her alleged hearing impairment when she was testifying at trial, which allegedly resulted in his wife being upset afterwards because she felt the prosecutor twisted her words. (ECF No. 6, Pet. Brief at 69-76.) However, the trial transcripts show that Mrs. Gilreath informed the court as to her difficulty hearing, and that she asked for questions to be repeated when needed. Moreover, this Court notes, as did the PCR court, that Petitioner's wife did not testify at the PCR proceeding, despite the numerous witnesses called on behalf of Petitioner. Thus, there is no evidence to dispute counsel's testimony that he met with and prepared his witnesses for trial. Accordingly, Petitioner is not entitled to habeas relief on this ineffectiveness claim of failing to prepare witnesses for trial because Petitioner has failed to establish the first prong under *Strickland*, deficient performance. *See Lewis v. Horn*, 581 F.3d 92, 107 (3d Cir. 2009).

5. *Failure to Allow Petitioner to Testify at Trial*.

Next, Petitioner argues that his counsel was ineffective for not allowing Petitioner to testify at trial in his own defense. Petitioner claims that he told Neary he wanted to testify at trial but was advised by Neary that it was against his best interests. The PCR court quickly rejected this claim as "totally incredible," highlighting that the trial transcript was "abundantly clear that [Petitioner], with the advice of counsel, chose not to testify." (ECF No. 6-3 at Pa194, PCR Decision at 14.)

26

On PCR appeal, the Appellate Division found:

> These conclusions are fully supported by the record and Neary's testimony. Defendant was advised of his right to testify or not to testify in his own defense, and defendant made his own independent decision not to testify after receiving advice. In addition, the decision of whether to recommend that a defendant testify in a criminal case is a fact-sensitive, strategic determination that falls within trial counsel's discretion. Nothing in the credible record supports defendant's position that he was prevented from testifying against his will.

*Gilreath*, 2010 WL 5140465 at *16.

A criminal defendant has a constitutional right to testify on his own behalf, a right which may only be waived by the defendant. *Rock v. Arkansas*, 483 U.S. 44, 50–53 (1987); *United States v. Pennycooke*, 65 F.3d 9, 10 (3d Cir. 1995). *See also United States v. Rahamin*, 168 F. App'x 512, 519 (3d Cir. 2009); *Donna v. United States*, Civ. No. 10–1607, 2011 WL 322636, at *5 (D.N.J. Jan.31, 2011) ("The decision whether to testify is a 'fundamental' litigation decision not left solely to counsel's professional judgment, and is for the client to make.") (citing *Sistrunk v. Vaughn*, 96 F.3d 666, 670 (3d Cir. 1996)). Moreover, a defendant's waiver of his right to testify must be voluntary, knowing and intelligent. *Pennycooke*, 65 F.3d at 11. The duty of providing such advice on whether to testify and ensuring that any waiver is knowing and intelligent rests with defense counsel. *Id.* at 12. A presumption remains, however, that where a defendant is represented by counsel, counsel has presumably discussed the defendant's right to testify with him, and defendant voluntarily and intelligently waived that right. *See Glenn v. Wynder*, 2012 WL 4107827, * 40 (W.D. Pa. Sep. 19, 2012) (citing *Pennycooke*, 65 F.3d at 12–13.) Consequently, to succeed on a claim of ineffective assistance for failure to allow a defendant to testify, the petitioner must overcome these presumptions. *Id.* Moreover, in order to demonstrate prejudice for a claim of ineffective assistance for failure to allow a defendant to testify, a petitioner must put forth more than a "bald assertion" that he was not allowed to testify,

including some specifics as to what his testimony would have been. *Palmer v. Hendricks*, 592 F.3d 386, 399 (3d Cir. 2010) (holding that petitioner's mere stated desire to tell his side of the story "falls far short of satisfying *Strickland*'s prejudice element").

This Court's review of the record shows that Petitioner plainly chose not to testify. The trial transcript clearly establishes that it was Petitioner's decision. During the colloquy, Petitioner affirmed that he understood it was his choice to testify or not, and that he voluntarily elected not to testify after conferring with his counsel. Neary also confirmed to the trial court that he had discussed the matter with Petitioner, advised him strategically, and told Petitioner that the Constitution makes it Petitioner's choice and not his attorney's decision. (ECF No. 6-15, September 25, 1998 Trial Transcript at 82:17-84:9.) Thus, given the trial and PCR record, this Court could not possibly find that the state court(s) unreasonably applied clearly established federal law or arrived at a decision that was based on an unreasonable determination of the facts based on the record before them. Petitioner clearly was informed of his right to testify, and he made a free, voluntary decision to rely on his attorney's strategic advice that he stay off the witness stand. This ineffective assistance claim is denied accordingly.

6. *Failure to Argue that Verdict Was Against the Weight of Evidence.*

Petitioner next argues that his counsel was ineffective because he failed to raise on appeal that the verdict was against the weight of evidence. On PCR review, Judge Reddin found no validity to Petitioner's claim. He recounted the "abundance of credible evidence" at trial, noting that the entire case rested on the identification of the assailant, and the jury found the victim's identification to be credible. Namely, the evidence showed the victim's detailed description of the attacker that closely and accurately described Petitioner; testimony by Petitioner's wife and Mr. Cava placing Petitioner in close proximity to the crime scene at the time of the attack; the

rendered sketch being "remarkably similar" to Petitioner; the victim picking Petitioner's photo from the second array but not the first, and not identifying Petitioner's clothes as the attackers showed her independent recollection unprompted by police; the victim's identification of Petitioner in court; and Petitioner's initial request to the Cavas for an alibi on September 6th (the actual date of the offense) rather than September 9th, the date mistakenly cited on the criminal complaint. (ECF No. 6-3 at Pa195-Pa196, PCR Decision at 15-16.)

The Appellate Division likewise rejected Petitioner's claim on his PCR appeal, noting that to reverse a conviction on the ground that it was against the weight of evidence, the court must find plain error "clearly capable of producing an unjust result." *Gilreath*, 2010 WL 5140465 at *17 (citing N.J.Ct.R. 2:10-2). The Appellate Division found that the evidence at trial, as correctly discussed by Judge Reddin, conclusively showed that Petitioner could not establish that his conviction was against the weight of the evidence. *Id*

A sufficiency of the evidence claim is governed by *Jackson v. Virginia*, 443 U.S. 307, 318 (1979). "[I]n a challenge to a state criminal conviction brought under 28 U.S.C. § 2254–if the settled procedural prerequisites for such a claim have otherwise been satisfied-the applicant is entitled to habeas corpus relief if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Id*. at 324; *accord McDaniel v. Brown*, 558 U.S. 120, 121 (2010) (per curiam). *Jackson* "requires a reviewing court to review the evidence in the light most favorable to the prosecution. Expressed more fully, this means a reviewing court 'faced with a record of historical facts that supports conflicting inferences must presume-even if it does not affirmatively appear in the record-that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" *McDaniel*, 558 U.S. at 133 (quoting *Jackson*, 443 U.S. at 326); *see also House v.*

*Bell*, 547 U.S. 518, 538 (2006) ("When confronted with a challenge based on trial evidence, courts presume the jury resolved evidentiary disputes reasonably so long as sufficient evidence supports the verdict"). The Court emphasized that "the standard ... does not permit a court to make its own subjective determination of guilt or innocence." *Jackson*, 443 U.S. at 320, n. 13. Moreover, "a reviewing court must consider all of the evidence admitted by the trial court, regardless whether that evidence was admitted erroneously." *McDaniel*, 558 U.S. at 131 (citation and internal quotation marks omitted). Further, "under Jackson, the assessment of credibility of witnesses is generally beyond the scope of review." *Schlup v. Delo*, 513 U.S. 298, 330 (1995). The question is "whether, viewing the evidence in the light most favorable to the state, it was objectively unreasonable for the Appellate Division to conclude that a rational trier of fact could have found, beyond a reasonable doubt that [petitioner] was guilty[.]" *Kamienski v. Hendricks*, 332 F. App'x 740, 747 (3d Cir. 2009).

This Court finds that the New Jersey court's rejection of Petitioner's sufficiency of the evidence claim, based on the actual and significant evidence relied upon by the jury at trial, was not contrary to, or an unreasonable application of *McDaniel* and *Jackson*. Specifically, the Court observes that the evidence at trial was compelling, *i.e.*, the victim's identification was strong – she gave a detailed description of her attacker that accurately described Petitioner, and the rendered sketch based on the victim's description was strikingly similar to Petitioner. L.S.'s identification was further strengthened by her firm selection of Petitioner's photo from a second array, not the first, and there was no suggestion of coaching or prompting by police because L.S. did not identify the clothing seized from Petitioner's residence as the clothes worn by her attacker. Moreover, the alibi testimony of Blanca Gilreath and James Cava actually placed Petitioner in close proximity to the crime scene at the time of the attack. Thus, even if counsel

had raised an insufficiency of evidence argument on appeal, it obviously would have failed for lack of validity.  Consequently, Petitioner cannot satisfy either prong under Strickland, and this ineffective assistance claim is denied for lack of merit.

       7.  *Failure to Raise Issue of Juror Misconduct.*

      Petitioner further argues that his trial counsel was ineffective for failing to raise an allegedly serious issues of juror misconduct.  Specifically, it is alleged that Assistant Prosecutor Squitieri had spoken to, laughed with, or improperly interacted with the jury.  Petitioner had introduced the testimony of two witnesses at his PCR hearing, Keri Pravec (Petitioner's sister) and Patricia Sicoli (a family friend), who stated that they had observed Squitieri conversing and laughing with jurors, which appeared to be an attempt to establish a rapport with the jury.  (ECF No. 6-19, Sep. 15, 2006 PCR Transcript (20T) at 12:13-15:23; 15T at 98:21-99:11 and 106:20-107:9.)

      In another incident, Petitioner alleges that his wife was upset in the bathroom after her trial testimony and stated in the presence of a juror that she "messed up" while testifying in court.  Keri Pravec also was present during this incident and Neary testified that he remembered only that Blanca Gilreath was upset after her testimony and that Keri Prevac was there with her.  (ECF No. 6-18, Sep. 7, 2006 PCR Transcript ("18T") at 5:19-6:4; 6:13-14.)  Petitioner argues that this utterance by Petitioner's wife was prejudicial because she was referring to her hearing impairment and not her actual testimony, which was likely misconstrued by the juror.  (ECF No. 6, Pet. Brief at 94-95.)

      In his written decision, Judge Reddin concluded that nothing improper had occurred.  He based his decision on the PCR testimony, finding Squitieri's testimony "highly credible."  (ECF No. 6-3 at Pa194, PCR Decision at 14.)  Judge Reddin also found that the interaction between the

jurors and Squitieri was "extremely minimal" or "trivial at best." Their interaction had occurred in an open hallway when the jurors and others were entering the courtroom. (*Id.* at Pa194-Pa195, PCR Decision at 14-15.) The judge further ruled that the second incident was "incredible" as Petitioner's wife did not testify to same at the PCR hearing and no juror mentioned the alleged incident to the court or to a court officer at the time. The PCR court determined that counsel was not deficient in ignoring these alleged incidents and that the incidents would not have had any effect on the outcome of trial if they had been raised at the time. (*Id.* at Pa195, PCR Decision at 15.) On the PCR appeal, the Appellate Division affirmed, finding that Petitioner had not demonstrated that Neary's failure to raise these minor issues of juror misconduct was deficient performance that prejudiced Petitioner's defense. *Gilreath*, 2010 WL 5140465 at *17.

Having carefully reviewed the trial and PCR record, this Court finds that the state courts' determination that counsel was not deficient and that no prejudice ensued with regard to trivial matters of alleged juror misconduct is not an unreasonable application of *Strickland*. It is extremely unlikely that a singular instance of minimal interaction between the assistant prosecutor and the jurors in the brief moment they entered the courtroom at the same time would suffice to undermine the jury's competency. Moreover, as to the alleged incident where a juror apparently overheard Petitioner's wife in the bathroom, there was no corroborating evidence other than the PCR testimony of Petitioner's sister. Petitioner's wife did not testify to this incident and no juror brought this matter to the trial court's attention at the time. Consequently, the state courts were not unreasonable in finding the incident too trivial to influence the jury's decision. Further, the state courts were reasonable in finding no factual basis for this claim.

8. *Failure to File a Motion to Dismiss the Indictment.*

Finally, Petitioner asserts that his trial counsel was ineffective because he did not file a motion to dismiss the indictment based on allegations of prosecutorial misconduct. The state courts rejected this claim, finding that no prosecutorial misconduct had occurred. Therefore, there was no ground to dismiss the indictment, and even if counsel had made such a motion, it would have been denied. *Gilreath*, 2010 WL 5140465 at *18.

This Court finds that the state courts' decision was not an unreasonable application of *Strickland*, which requires Petitioner to show to a reasonable probability that the outcome of the proceeding would have been different. Accordingly, for the reasons expressed more fully in Section B of this Opinion, which addresses Petitioner's prosecutorial misconduct claim, *infra*, Petitioner is not entitled to federal habeas relief on this claim that counsel was ineffective for failing to file a motion to dismiss the indictment.

In conclusion, this Court finds that Petitioner has failed to establish that the state court adjudication of these ineffective assistance of counsel claims was contrary to, or an unreasonable application of, Supreme Court precedent, or that the determination of facts in state court was unreasonable. Therefore, all claims of ineffective assistance of counsel asserted in Petitioner's first ground for habeas relief are denied for lack of merit.

B. Claims of Prosecutorial Misconduct

Petitioner also contends that he is entitled to habeas relief because his conviction was obtained in violation of his federal constitutional right to due process and a fair trial due to his criminal trial being "tainted by egregious prosecutorial conduct." (ECF No. 6, Pet. Brief at 97.) Petitioner claims that the State (1) "purposely presented false and misleading evidence to the grand jury;" (2) withheld exculpatory evidence; (3) tainted the in-court identification; (4) and

failed to videotape the photo line-up and sketch production and to preserve the photographs used for the composite sketch. (*Id*. at 98-119.)  These claims were raised by Petitioner in his state PCR proceedings.

      1. *False and Misleading Testimony*.

      In his first claim of prosecutorial misconduct, Petitioner states that the prosecutor presented false and misleading testimony to the grand jury when asking the investigator if Petitioner was apprehended or arrested as a result of L.S.'s identification of Petitioner's photo, her description of her attacker, and the clothing items seized as described by L.S.  The investigator responded affirmatively.  Petitioner argues this question was purposely false and misleading, and highly prejudicial because L.S. had stated to police that the clothing they seized from Petitioner was not that worn by her assailant.  The state PCR court rejected this claim as meritless, finding no bad faith on the part of the prosecutor because the question posed did not indicate that L.S. had herself identified Petitioner's clothing as the same as the clothing worn by her attacker.  The court also concluded that this question played little or no role in the return of the Indictment given the other testimony and factual information presented to the grand jury.  Finally, the court observed that, during trial, L.S. did not identify the clothing seized from Petitioner as the clothing worn by her assailant.  (ECF No. 6-3 at Pa197-Pa198, PCR Decision at 17-18.)  The Appellate Division affirmed this ruling on Petitioner's appeal from the PCR court's decision. *Gilreath*, 2010 WL 5140465 at *18.

      Generally, deficiencies in state grand jury proceedings are not grounds for relief under 2254. *See Lopez v. Riley*, 865 F.2d 30, 32 (2d Cir. 1989).  This conclusion flows from *United States v. Mechanik*, 475 U.S. 66 (1986), in which the Supreme Court held that a violation of Fed.R.Crim.P. 6(d) (which governs who may be present while the grand jury is in session,

deliberating, or voting), discovered only at trial, did not justify relief after the petit jury had rendered its verdict.

> [T]he petit jury's subsequent guilty verdict means not only that there was probable cause to believe that the defendants were guilty as charged, but also that they are in fact guilty as charged beyond a reasonable doubt. Measured by the petit jury's verdict, then, any error in the grand jury proceedings connected with the charging decision was harmless beyond a reasonable doubt.

*Mechanik*, 475 U.S. at 70 (footnote omitted); *see also United States v. Bansal*, 663 F.3d 634, 648-49 (3d Cir. 2011) (holding that a petit jury's guilty verdict renders harmless any prosecutorial misconduct or other set of errors made in connection with the indictment). *See also Lafler v. Cooper*, 132 S.Ct. 1376, 1386 (2012). Thus, to the extent there were any deficiencies in the grand jury proceedings, they must be considered harmless.

This Court finds no merit to Petitioner's claim of prosecutorial misconduct on this ground. While the prosecutor's compound question was somewhat confusing, there is no hint of bad faith. Nor does the question suggest that the victim actually identified Petitioner's clothing as those worn by her attacker. More importantly, however, it was confirmed at trial, by L.S.'s own testimony, that she did not identify the clothing seized from Petitioner as the clothing worn by the perpetrator. Thus, the petit jury's verdict of guilt after hearing all of the evidence at trial renders harmless this weak and meritless claim of prosecutorial misconduct during the grand jury presentation. This claim is denied accordingly.

2. *Withholding Exculpatory Evidence.*

In this claim, Petitioner argues that the prosecutor intentionally withheld exculpatory discovery materials from Petitioner, including a three-page report from the Haledon Police Department, a six-page report, diagrams of an adult male and female child, and a Child Abuse Referral form. The three-page police reports withheld was significant because they referenced

other similar incidents that had occurred in the same general area, and Petitioner had an alibi defense.  The six-page report noted that L.S. had refused to speak with an Investigator because he resembled the man who assaulted her, and that L.S. had not identified the clothing seized from Petitioner as that worn by her attacker.  The Child Abuse Referral form refers to "flasher" incidents in Haledon and nearby Prospect Park during September 1996.  (ECF No. 6, Pet. Brief at 108-09.)

The PCR court found that the prosecution's initial failure to provide this information was based on inadvertence and a good faith mistake.  More importantly, however, the court concluded that there was no prejudice to Petitioner at trial because the information was given to Petitioner's counsel six months before trial, giving defense counsel sufficient time to prepare and address the issues at trial.  Indeed, defense counsel "continuously explored the issues regarding other attacks and other attackers" during trial.  (ECF No. 6-3, Pa198-Pa199.)  The Appellate Division affirmed the PCR court's decision on this issue without discussion.  *Gilreath*, 2010 WL 5140465 at *18.

A criminal defendant's due process rights are violated if prosecutorial misconduct renders a trial fundamentally unfair.  *See Darden v. Wainwright*, 477 U.S. 168, 182–83 (1986).  "When analyzing a claim of prosecutorial misconduct, the key question is whether [the misconduct] 'so infec[ted] the trial with unfairness as to make the resulting conviction a denial of due process.'"  *Rolan v. Coleman*, 680 F.3d 311, 321 (3d Cir. 2012) (quoting *Greer v. Miller*, 483 U.S. 756, 765 (1987)) (quotation marks and citation omitted).

"[T]he suppression by the prosecution of evidence favorable to an accused ... violates due process where the evidence is material either to guilt or to punishment."  *Brady v. Maryland*, 373 U.S. 83, 87 (1963).  This rule requires prosecutors to disclose known material information

favorable to the accused and "to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995); *see also Copling v. Cathel*, Civ. No. 05-6010, 2013 WL 2338504, *11 (D.N.J. May 28, 2013). Thus, *Brady* expressly proscribes withholding evidence "favorable to an accused" and "material to [his] guilt or to punishment." *Cone v. Bell*, 556 U.S. 449, 451 (2009). To establish that a *Brady* violation undermines a conviction, a convicted defendant must make each of three showings: (1) the evidence at issue is "favorable to the accused, either because it is exculpatory, or because it is impeaching"; (2) the State suppressed the evidence, "either willfully or inadvertently"; and (3) "prejudice ... ensued." *Strickler v. Greene*, 527 U.S. 263, 281–282 (1999); *see Banks v. Dretke*, 540 U.S. 668, 691 (2004). "The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682 (1985). Thus, nondisclosure merits relief only if the prosecution's failure "'undermines confidence in the outcome of the trial.'" *Kyles v. Whitly*, 514 U.S. 419, 434 (1995) (quoting *Bagley*, 473 U.S. at 678).

This Court finds no merit to Petitioner's claim because Petitioner cannot establish all three requirements necessary to prove that a *Brady* violation undermined his conviction. While the reports arguably may be exculpatory, there is no evidence that the prosecution's late delivery of the discovery was anything more than inadvertence. More significantly, however, as the PCR court noted, no prejudice ensued. Petitioner's counsel received this exculpatory information six months before trial, giving him adequate time to prepare and use at trial, which he did. Therefore, the state court decision on this issue was neither contrary to, nor an unreasonable

application of, clearly established federal law, nor was the state court decision based upon an unreasonable determination of the facts in light of the evidence presented to it. Petitioner is not entitled to relief on this claim.

    3. *A Tainted In-Court Identification.*

Petitioner next alleges that the prosecution "tainted" the in-court identification of Petitioner by inappropriately revealing to L.S. that Petitioner was a suspect in another alleged sexual assault, and by coaching L.S. and telling her where Petitioner would be sitting in the courtroom. (ECF No. 6, Pet. Brief at 111-116.) The PCR court addressed only the issue of coaching in its October 22, 2007 written decision. (ECF No. 6-3 at Pa199-Pa200, PCR Decision at 19-20.) The court found that Assistant Prosecutor Squitieri's conduct in this instance was appropriate given the victim's young age and expected anxiety of entering a court room. (*Id.* at Pa199.) More importantly, the court concluded that there was no prejudice because defense counsel had the opportunity to question the assistant prosecutor's " coaching" and present it to the jury at the time of trial. The jury was well aware that L.S. had been brought into the courtroom before her testimony and was told where Petitioner would be sitting. Thus, "the jury had every opportunity to consider that procedure in deciding how valid or accurate the in Court identification of the defendant was." (*Id.* at Pa200.)

The Appellate Division affirmed the PCR court's decision on appeal. Specifically, the Appellate Division found that the assistant prosecutor's conduct was not improper, remarking:

> The prospect of participating in a trial, whether criminal or civil, is daunting to any layperson not familiar with the process and especially to an eleven-year-old victim of a sexual assault. To introduce a participant to the courtroom setting is neither improper coaching nor prosecutorial misconduct. If anything, it represents appropriate preparation and in many instances, a method of relieving some of the anxiety that will accompany exposure to a trial setting. Criticism of the prosecutor's conduct in this instance is misplaced.

*Gilreath*, 2010 WL 5140465 at *18.

  This Court finds that the decision of the state courts in rejecting this claim of prosecutorial misconduct was neither contrary to, nor an unreasonable application of, clearly established federal law, nor was the state court decision based upon an unreasonable determination of the facts in light of the evidence presented to it.  The "Supreme Court precedent counsels that the reviewing court must examine the prosecutor's offensive actions in context and in light of the entire trial, assessing the severity of the conduct, the effect of the curative instructions, and the quantum of evidence against the defendant."  *Moore v. Morton*, 255 F.3d 95, 107 (3d Cir. 2001); *see also Brecht v. Abrahamson*, 507 U.S. 619,  638 (1993) (holding that prosecutorial misconduct is examined in "light of the record as a whole" in order to determine whether the conduct "had a substantial and injurious effect or influence" on the jury's verdict).  This Court agrees that Squitieri's minimal "coaching" of a young and scared victim as to where the participants in a criminal trial would be sitting was not offensive or improper under the circumstances.  Moreover, Squitieri's conduct in this regard had little influence on the jury's verdict because defense counsel made the jury well aware of the "coaching" and how it could affect L.S.'s in-court identification.  Thus, the jury had the opportunity to consider and weigh this information when reaching its verdict.

  This Court also finds no merit to the claim that the prosecution improperly disclosed to L.S. that Petitioner was a suspect in another alleged assault.  There is no testimony or evidence to show that the prosecution informed L.S. during the identification procedures (the sketch process or photo line-ups) about a October 18, 1996 Ridgewood, Bergen County incident[4] in which

---

[4] In mid-2001, long after Petitioner's September 1998 trial in this case,  Petitioner was tried for the attempted kidnapping of two 12-year old girls whom Petitioner had accosted on a Ridgewood street on October 18, 1996, more than a month after the sexual assault of L.S. on September 6, 1996.  In July 1997, the State moved to introduce evidence of the September 6, 1998 sexual

Petitioner was a suspect.  Rather, it appears that disclosure occurred much later, presumably in July 1997 (*see* fn 4 below), because the prosecutor in the Ridgewood matter had intended on calling L.S. as a witness in Petitioner's trial on the Ridgewood case, for purposes of proving intent under N.J.Evid.R. 404(b).  Consequently, it would have been impossible for the prosecution in this case to avoid telling L.S. about Petitioner's involvement in the Ridgewood matter, because L.S. needed to be informed and prepared emotionally in the event she had to appear in court and face Petitioner in the Ridgewood case.  (ECF No. 19-2, Resp.'s Brief at 42, 103-104; ECF No. 17-5 at Ra367-Ra375.)  Thus, this Court finds that any disclosure made by Assistant Prosecutor Squitieri to L.S. about the Ridgewood matter was not improper and plainly does not rise to the level of inappropriate conduct by the prosecutor that would violate Petitioner's right to due process and a fair trial.  Accordingly, Petitioner is not entitled to habeas relief on these grounds of alleged prosecutorial misconduct.

4. *Failure to Video-Tape Photo Line-Up and Sketch Production*.

Petitioner's final claim of prosecutorial misconduct asserts that the prosecutor failed to video-tape the identification procedures, namely, the photo line-up and the sketch process, and that the prosecutor failed to preserve the photographs used in creating the sketch.  Petitioner relies substantially on *State v. Michaels*, 136 N.J. 299 (1994), which held that the failure to video-tape interviews with a child victim of sexual assault provides a potential for producing unreliable information.  *Id*. at 312.  The State counters that the prosecutor had no obligation by law or policy to video-tape the photo line-up and sketch procedure or to preserve the various

---

assault on L.S. in the Ridgewood case, pursuant to N.J.Evid.R. 404(b).  The motion judge reserved decision on the State's motion, and on November 17, 1999, more than a year after conclusion of the trial in the sexual assault case involving L.S., the motion judge granted the State's motion to allow admission of Petitioner's conviction for the limited purpose of proving intent and motive in the attempt to kidnap the two girls.  However, the judge barred L.S. from testifying at the trial in the Ridgewood matter.  (ECF No. 17-5, Respondents' Appendix ("Ra") at Ra367-Ra375.)

stock photos used by the sketch artist to draft the facial features that comprised the final sketch. (ECF No. 19-2, Resp.'s Brief at 104.)

This claim was raised in the PCR proceedings. Judge Reddin rejected the claim as meritless, finding no obligation on the part of the State to retain stock photos used to draft the composite sketch, or to video-tape the sketch procedure or photo line-up. Moreover, Judge Reddin concluded that there was no prejudice to Petitioner because defense counsel had presented these arguments to the jury so as to undermine the veracity and weight of the photo line-up identification and the sketch, and the jury apparently gave little weight to the arguments in reaching their verdict of guilt. (ECF No. 6-3, Pa200-Pa201.) The Appellate Division affirmed without discussion the PCR court's decision on appeal. *Gilreath*, 2010 WL 5140465 at *18.

This Court likewise finds no basis to grant habeas relief on this claim of prosecutorial misconduct. The state PCR court properly found no merit to the claim because there was no policy and procedure in place at the time requiring the video-taping of the photo line-up or sketch process and there was no legal basis for the claim under either state law or federal law. Thus, the New Jersey courts' adjudication of this prosecutorial misconduct claim was not contrary to, or an unreasonable application of Supreme Court precedent, and Petitioner is not entitled to habeas relief on this ground.

C. Denial of *Wade* Hearing Claim

In Ground Three of his petition, Petitioner argues that the trial court erred in denying him a *Wade* hearing before trial in violation of his rights of due process and a fair trial. Petitioner raised this claim on direct review, but the Appellate Division roundly rejected Petitioner's arguments. Relying on Supreme Court precedential cases, namely, *Simmons v. United States*,

390 U.S. 377 (1968), *Neil v. Biggers*, 409 U.S. 188 (1972), and *Manson v. Brathwaite*, 432 U.S. 98 (1977), the Appellate Division found (1) no evidence that the police had utilized impermissibly suggestive identification procedures; (2) that L.S. was a reliable witness who "unhesitatingly chose defendant's photo from the array;" and (3) it was "not likely that defendant would have prevailed had a *Wade* hearing been held."   (ECF No. 6-1 at Pa53-Pa57, *State v. Gilreath*, No. A-4118-98T2 (App. Div. June 15, 2000) (slip op. at 11).)

The Supreme Court has observed that improper pretrial identification procedures by police may cause witnesses to misidentify a criminal. *See Simmons v. United States*, 390 U.S. 377, 383 (1968).   An identification procedure may be deemed unduly and unnecessarily suggestive if it is based on police procedures that create "a very substantial likelihood of irreparable misidentification." *Id.* at 384.  In that case, "the witness thereafter is apt to retain in his memory the image of the [misidentification] rather than that of the person actually seen, reducing the trustworthiness of subsequent lineup or courtroom identification." *Id.* at 383–84. "It is the likelihood of misidentification which violates a defendant's right to due process.... Suggestive confrontations are disapproved because they increase the likelihood of misidentification." *Neil v. Biggers*, 409 U.S. 188, 198 (1972).

The Supreme Court has held that, even if an identification procedure is unnecessarily suggestive, admission of the suggestive identification does not violate due process so long as the identification possesses sufficient aspects of reliability, *Manson v. Brathwaite*, 432 U.S. 98, 106 (1977), for reliability is the "linchpin in determining the admissibility of identification testimony." *Id.* at 114; *see also United States v. Wise*, 515 F.3d 207, 215 (3d Cir. 2008).  The central question is "whether under the totality of the circumstances the identification was reliable even though the confrontation procedure was suggestive." *Brathwaite*, 432 U.S. at 106 (quoting

*Biggers*, 409 U.S. at 199); *see also United States v. Maloney*, 513 F.3d 350, 355 (3d Cir. 2008). Factors to be considered include "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." *Biggers*, 409 U.S. at 199. Significantly, the Supreme Court has ruled that, where "identifications were entirely based upon observations at the time of the [incident] and not at all induced by the conduct" of the pretrial identification procedures, the identification does not violate due process. *See Coleman v. Alabama*, 399 U.S. 1, 7 (1970).

Here, the New Jersey courts' admission of the in-court identifications of Petitioner was not contrary to, or an unreasonable application of the factors which the Supreme Court requires to be considered in evaluating the likelihood of misidentification. *See Biggers*, 409 U.S. at 199. The state court record shows no evidence of an impermissibly suggestive identification procedure by police. Moreover, L.S. was firm and decisive in picking Petitioner's photo from the second photo line-up, and the composite sketch drawn by the sketch artist based on L.S.'s description and use of stock photos was strikingly similar to Petitioner, buttressing the reliability of the identification. These factors clearly show that Petitioner would not have succeeded if a *Wade* hearing had been held. Therefore, under these circumstances, the adjudication of Petitioner's identification claims was not contrary to, or an unreasonable application of *Biggers* and other applicable Supreme Court jurisprudence and Petitioner is not entitled to habeas relief on this claim.

D.  Cumulative Error

In Ground Four, Petitioner argues that the cumulative errors mandate that his conviction be reversed.

The test for a "cumulative error" claim is whether the overall deficiencies "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *See Hein v. Sullivan*, 601 F.3d 897, 917 (9th Cir. 2010) (relying on *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)); *Thornburg v. Mullin*, 422 F.3d 1113, 1137 (10th Cir. 2005) (relying on *Donnelly*, 416 U.S. at 643); *see also Fahy v. Horn*, 516 F.3d 169, 205 (3d Cir. 2008) ("Cumulative errors are not harmless if they had a substantial and injurious effect or influence in determining the jury's verdict, which means that a habeas petitioner is not entitled to relief based on cumulative errors unless he can establish 'actual prejudice.'").

As discussed above, this Court, along with the state courts, finds that there is no merit to Petitioner's claims of individual errors.  As such, there is no basis or merit for habeas relief based upon an alleged accumulation of errors that did not exist.

## V.  CERTIFICATE OF APPEALABILITY

This Court next must determine whether a certificate of appealability should issue.  *See* Third Circuit Local Appellate Rule 22.2.  The Court may issue a certificate of appealability only if the petitioner "has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  For the reasons discussed above, this Court's review of the claims advanced by Petitioner demonstrates that he has failed to make a substantial showing of the denial of a constitutional right necessary for a certificate of appealability to issue.  Thus, this Court declines to issue a certificate of appealability pursuant to 28 U.S.C. § 2253(c)(2).

## VI. CONCLUSION

For the above reasons, this Court finds that the § 2254 habeas petition must be denied, and a certificate of appealability will not issue.  Further, Petitioner's Motion to Strike the State's Brief and Appendix (ECF No. 23) is denied.  An appropriate Order follows.


_____
MICHAEL A. SHIPP
United States District Judge

DATED:  9/30/14